UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT ALLEN KNUTH,                )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )    Case No. 4:15-CV-1351 (CEJ)
                                   )
CAROLYN W. COLVIN, Acting          )
Commissioner of Social Security,   )
                                   )
          Defendant.               )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On May 29, 2009, plaintiff Robert Allen Knuth filed applications for a period of disability, disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., and for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of June 1, 2008. (Tr. 243-46, 247-50). After plaintiff's applications were denied on initial consideration (Tr. 100, 101), and reconsideration (Tr. 102, 103), he requested a hearing from an Administrative Law Judge (ALJ). Following a hearing on June 7, 2011, (Tr. 30-52), the ALJ issued a decision denying plaintiff's applications on August 24, 2011. (Tr. 107-16). On October 5, 2012, the Appeals Council vacated the hearing decision and remanded plaintiff's case to the ALJ with instructions to "obtain additional evidence . . . includ[ing] a consultative mental examination with psychological testing and medical source statements;" evaluate third-party evidence; further evaluate plaintiff's subjective complaints and mental impairments; and obtain additional evidence if necessary. (Tr. 122-24). Plaintiff and counsel appeared for an additional hearing conducted by video on February 14,

2014. (Tr. 53-99). The ALJ again denied plaintiff's applications on March 13, 2014. (Tr. 14-23). The Appeals Council denied plaintiff's request for review on June 25, 2015.  (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability Application Documents

Plaintiff completed a Disability Report on June 9, 2009, listing his disabling conditions as fetal alcohol syndrome, learning disabilities, and mental health problems. (Tr. 319-25). He reported that he had been placed in special education services and that he had difficulty with reading, writing, and math. He had previously worked as a janitor, stopping on June 1, 2008, due to his conditions. Plaintiff did not list any medications in his Disability Report.

The record contains Function Reports completed in May and June 2009 by plaintiff and a friend, Linda Burnett. In his report, plaintiff reported that he lived with friends. (Tr. 326-23). Plaintiff woke up about 5:00 in the morning. On days when he felt able to do so, he went out to look for work; otherwise, he avoided other people. He prepared sandwiches and pizza for himself and, with reminders, did his own laundry and washed dishes. Ms. Burnett reported that plaintiff also did mowing and raking. Plaintiff wrote that he sometimes shopped for food, but had to work up his nerve to go in stores. Ms. Burnett reported that plaintiff occasionally shopped for leather and beads for Indian crafts. Plaintiff wrote that he was unable to pay bills, count change or handle bank accounts, while Ms. Burnett stated that plaintiff was able to count change and could pay bills when reminded to do so. Plaintiff identified his hobbies as going to schools to talk about Native Americans.

Ms. Burnett additionally wrote that plaintiff's activities included watching television, visiting friends, walking in the woods, and working to protect the environment and Indian gravesites. Plaintiff regularly attended Alcoholics Anonymous (AA) meetings and spoke at treatment centers about drug and alcohol abuse. He tried to avoid authority figures and generally preferred doing things on his own because it was "just easier." With respect to his ability to work with others, plaintiff's learning disabilities exposed him to name calling or termination. He responded to stress and changes in routine with anger or severe depression. He had problems with talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. Although he had trouble following written instructions, he could follow clear spoken instructions. In a brief narrative statement, plaintiff wrote that he thought he was able to talk about Native Americans and other things he knows well. He had been sober for fourteen years. Ms. Burnett noted that plaintiff had two daughters and a stepdaughter for whom he provided support when able. (Tr. 315).

The record includes three additional reports from Ms. Burnett. On November 20, 2009, she reported that plaintiff had been struggling with depression and suicidal thoughts following the death of his mentor in September. (Tr. 338-44). He could not take antidepressants because they caused dangerously strong suicidal urges. Ms. Burnett described plaintiff as unable to care for himself and reliant on friends for housing, food, and general support. He had been unable to find work despite applying for jobs within a 30-mile radius of his home. Ms. Burnett opined that plaintiff had attention deficit disorder and needed frequent reminders "before taking action." A separate undated report adds that plaintiff struggled in the

workplace because other employees harassed him until he became angry and managers generally did not support him when he reported harassment. (Tr. 366-67). In another letter dated February 14, 2014, Ms. Burnett stated that plaintiff displayed unpredictable "bouts of anger" that took hours or days to dissipate. (Tr. 393).

## B.    Medical Records

On February 23, 2009, plaintiff sought treatment at the Earlham Medical Clinic, in Earlham, Iowa, for depression, with complaints of decreased appetite and sleep disturbance. (Tr. 395). He reported that he was going through a divorce. After many years of alcohol and drug use, he had been "clean and sober" for 17 years. He had a long history of depression and several siblings had committed suicide. Although he was not actively suicidal at the time, he expressed concern about "following the same path." The examiner noted that plaintiff was fully oriented, his memory was intact, he displayed normal judgment and insight, and his mood was neutral. Plaintiff was prescribed Citalopram, to start at 20 mg for a week before increasing to 40 mg. He was given a referral for psychological treatment.

On March 23, 2009, Timothy P. Olson, M.D., completed an evaluation of plaintiff's depression. (Tr. 398-99). Plaintiff reported that his depression began several months earlier when his wife of nine years requested a divorce. Plaintiff reported that he had felt confused for several months. He returned to the reservation in South Dakota but felt uncomfortable there and left. He was currently living with friends in Earlham. Plaintiff reported that he had abused alcohol and other substances in his teens and early twenties but had stopped about 16 years

earlier. He still attended substance abuse meetings and wanted to become a drug and alcohol counselor. His depressive symptoms included insomnia and withdrawal. He was unable to tolerate the higher dose of Citalopram. Nonetheless, he reported that his sleep had improved and he felt more outgoing and optimistic. He hoped to find work and get his own place to live. He did not work outside the home during his marriage. He had previously worked in housekeeping. On mental status examination, plaintiff was cooperative and oriented, his mood was neutral or slightly depressed with appropriate affect, and he had good insight. His intelligence was estimated to be in the normal or dull normal range. Plaintiff was directed to continue taking 20 mg of Citalopram and return in two months. Dr. Olson diagnosed plaintiff with Major Depression, single episode, versus Adjustment Disorder with Depressed Mood; Mixed Substance Dependence, in remission. Plaintiff was assigned a score of 58 on the Global Assessment of Functioning (GAF) scale.[1] On June 26, 2009, Dr. Olson reported to the disability examiner that plaintiff had not returned after his initial evaluation. Based on his single visit, Dr. Olson opined that plaintiff would have no more than mild limitations in work-related abilities and was capable of handling cash benefits. (Tr. 397).

On August 26, 2009, Arthur H. Konar, Ph.D., completed a consultative psychological evaluation. (Tr. 400-03). Plaintiff had previously worked in janitorial and "basic services" jobs. His last job had been as a motel bellman. He stated that

---

[1] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairments in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000) (DSM-IV). A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34.

there were times "socially when I don't want to be a janitor." He had no savings and was struggling to pay some overdue credit cards. He received food stamps and medical assistance. Plaintiff showed Dr. Konar a newspaper article reporting on his childhood abandonment, his mother's alcohol abuse, and his current fight against a development that threatened ancient burial grounds. He was placed in special education throughout his schooling and reported that he was better at math than reading. He had been sober for 17 years until a single relapse, weeks before the evaluation, when he drank until he blacked out. Plaintiff's depressive symptoms included sleep disturbance, self-doubt, isolation, poor focus, impaired concentration, tracking problems, and mood swings with anger and crying. He described himself as feeling abandoned and stupid, and "a little piece of junk" to be "kicked around." He recently had suicidal thoughts and inclinations, but he did not want to act on these thoughts. He did not display overt anxiety.

On examination, Dr. Konar described plaintiff as friendly and cooperative. Plaintiff had a calm demeanor and made good eye contact but appeared "down and out." His speech was flowing but somewhat slowed. He "may have some cognitive processing issues," although he displayed a sense of humor and approached the testing with good motivation. His performance on structured tasks showed "some" impairment in concentration and tracking, "marginal" memory functioning, below average verbal abstraction, and questionable judgment. Dr. Konar concluded that there were "strong indications of borderline intellectual functioning, and/or learning disabilities," possibly due to fetal alcohol syndrome or alcohol abuse. Dr. Konar diagnosed plaintiff with Major Depression, recurrent, moderate; Alcohol Dependence in long-term remission with recent relapse; and possible Reading

Disorder and Borderline Intellectual Functioning. Dr. Konar assigned a GAF score of 45-50.[2] With respect to work-related abilities, Dr. Konar opined that plaintiff was cognitively able to remember and understand instructions, procedures, and locations. However, his depression and cognitive issues impaired his abilities to carry out instructions and maintain attention and concentration. As a result of his "depressed posture" in combination with possible cognitive processing issues, he was "a diffuse and somewhat unreliable communicator." Thus, he was "only variably able" to interact appropriately with others in a work setting, use good judgment, or respond appropriately to changes in the work place. (Tr. 403)

On September 15, 2009, David Beeman, Ph.D., completed a Psychiatric Review Technique. (Tr. 409-22). Based on the record, Dr. Beeman concluded that plaintiff met the criteria for affective disorders (depressive syndrome) and substance addiction disorders (alcohol dependence in overall remission with one relapse). In a Mental Residual Functional Capacity Assessment, (Tr. 405-08), Dr. Beeman found that plaintiff was moderately limited in the abilities to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions and perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. In support of his conclusions, Dr. Beeman noted that plaintiff had quit work due to depression arising from his divorce. Plaintiff had not been psychiatrically hospitalized and there was no evidence of a period of decompensation. Dr. Beeman noted that Dr. Konar suggested possible borderline intellectual functioning while Dr. Olson had estimated

---

[2] A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." DSM-IV at 34.**Error! Main Document Only.**

plaintiff's intelligence as average to low average. Plaintiff's participation in a project defeating a development project and talks to school children regarding Native American culture suggested grossly intact intellectual and social skills. In addition, plaintiff's self-report of daily activities was sufficiently detailed and coherent, although academic limitations were evident. His memory was fair, he was able to drive, and generally capable of managing his affairs. Dr. Beeman concluded that plaintiff retained the ability to perform simple, routine, and repetitive work functions when motivated to do so.[3]

The record contains no evidence that plaintiff sought further treatment until May 2011 when he returned to the Earlham Medical Clinic with complaints of depression. (Tr. 429-34). On May 2, 2011, plaintiff complained to Eve Harris, P.A., of decreased appetite, lack of enjoyment, a desire to sleep, and he was planning suicide. He reported that a previous trial of Citalopram caused shaking and racing thoughts. Ms. Harris prescribed Prozac. (Tr. 430). On May 16, 2011, plaintiff reported that he had discontinued the Prozac because it made him too irritable. (Tr. 431-32). He was still experiencing significant insomnia, sadness, hopelessness, immense fatigue, and lack of appetite and interest. He reported that he had participated in outpatient counseling for six or seven months several years earlier and found it unhelpful. He believed that he would be happy if he could live alone in the woods and survive off the land. He continued to experience suicidal thoughts, especially after two other people in town committed suicide. He agreed not to act on his feelings. He was anxious about an upcoming disability hearing. (Tr. 429). On

---

[3] In February 2010, Dr. Beeman's Psychiatric Review Technique was affirmed as written because plaintiff had not sought further treatment or reported any changes in his activities of daily living. (Tr. 426).

examination, Ms. Harris reported that plaintiff was cooperative, depressed and unkempt, but not in acute distress. His judgment in social situations was inappropriate. He had impaired concentration and problem-solving. He recalled his past history, had an appropriate fund of knowledge and appropriate vocabulary, but was unaware of current events. He was started on Paroxetine and told to return in two weeks.

There is no evidence that plaintiff returned to see Ms. Harris until August 15, 2011, when he sought treatment for a skin rash on his arm that he acquired after getting a tattoo and then exposing the area to poison ivy while doing yard work. (Tr. 433-34).

On January 26, 2013, consultative psychologist Michael P. Baker, Ph.D., administered the Weschler Adult Intelligence Scale — 4th edition (WAIS-IV) and completed a psychodiagnostic mental status evaluation. (Tr. 435-38). Plaintiff reported that his longest period of employment was two years in 1989 when he worked road construction. He also worked for Goodwill for two years in the early 1990s. In 2007, he worked as a school janitor for a year and a half and, in 2012, he worked for a farmer for three months. Plaintiff reported that he was in three chemical dependency treatment programs through 1991 and that he had not used mood-altering substances for the past five years. He had stopped attending 12-step programs in 2011. He had resided with his sponsor for the past two years. Plaintiff did most of the cooking, housekeeping and laundry. He did not like to do the grocery shopping because there were too many people in the stores. His driver's license was suspended due to unpaid child support.

Plaintiff's scores on the WAIS-IV resulted in a Verbal IQ score of 91, a Performance IQ score of 81, and a Full Scale IQ score of 78, which placed him in the borderline range of intellectual functioning. He had significant weaknesses in indices for Working Memory and Processing Speed and displayed a great deal of variability across subscales, some of which could be attributed to a reading disability. Plaintiff's vocabulary and general fund of information were in the average range which might create an unrealistic expectation of his overall intellectual functioning. On mental status examination, plaintiff was cooperative, made good eye contact, and displayed normal speech patterns. His affect was somewhat restricted but not inappropriate. He was able to recall four out of four items after a four-minute delay and could subtract serial threes from 20 but could not subtract serial sevens from 100. He correctly spelled "world" backwards.

Dr. Baker gave plaintiff diagnoses of Major Depressive Disorder, moderate; Alcohol Dependence in reported long-term remission; and Borderline Intellectual Functioning. He assigned plaintiff a GAF score of 45.[4] In a Medical Source Statement, Dr. Baker opined that plaintiff had no restrictions in the abilities to understand, remember, and carry out simple instructions or make judgments on simple work-related decisions. He had mild restrictions in the abilities to understand and remember complex instructions, interact appropriately with others in the workplace, and respond appropriately to usual work situations and to changes in a routine work setting. Finally, Dr. Baker opined that plaintiff had moderate

---

[4] The record contains a letter written by Dr. Baker to plaintiff's counsel regarding another patient in which he states: "When I utilized the GAF score of 45, I did mean to indicate an opinion that he would not be able to sustain employment activities." (Tr. 455-56).

restrictions in the abilities to carry out complex and to make judgments on complex work-related decisions. (Tr. 440-42).

## C. <u>Testimony at June 7, 2011 Hearing</u>

Plaintiff was 43 years old at the time of the hearing. (Tr. 37). He was placed in special education throughout his entire schooling and was not taught to read and write. (Tr. 35). He acquired limited reading skills as an adult but was still unable to do any math. Plaintiff spent about three years working on and learning about Native American burial sites and visited schools once or twice a year to tell Native American stories to children. (Tr. 41).

Plaintiff had previously worked as a janitor. He testified that he had difficulty switching between tasks and required repeated explanations, which annoyed other people. (Tr. 35). He stopped working in 2008 because he became depressed.

Plaintiff testified that he started drinking when he was 12 years old. He stopped when he turned 21 after two arrests for driving while intoxicated. (Tr. 37). He had had one relapse during his divorce. At the time of the hearing, plaintiff reported that he was depressed and had suicidal feelings, although he had no plan to act on these feelings. (Tr. 37-38). He was unable to focus and had difficulty with his memory. He spent most of his time alone and avoided going out because he was fearful about interacting with others. He also avoided going to AA meetings unless they were very small. (Tr. 39-40). His doctor had recently prescribed antidepressant medications but he had difficulty with side effects, including insomnia and suicidal impulses. (Tr. 42-43).

When asked what problems kept him from working, plaintiff described himself as antisocial and explained that he had trouble interacting with others

because he did not understand how to fit in. When asked whether he was able to manage a simple job in which he worked alone, plaintiff testified that some days he was too depressed to leave home.

Vocational Expert Roger F. Marquardt, M.Ed., testified about the employment opportunities for a hypothetical individual of plaintiff's age, educational background, and work experience who required low-stress work, with no contact with the public and only limited contact with coworkers. Such an individual would be able to perform plaintiff's past relevant work as a commercial or industrial cleaner. (Tr. 46, 368). Other unskilled work available to the hypothetical individual included lodging cleaner and housekeeping, produce sorter, and labeler or ticketer. All work would be precluded if the individual missed three or more days of work each month due to mental impairments. (Tr. 47).

### D. Testimony at the February 14, 2014 Hearing

Plaintiff testified that he had not worked since 2008. The ALJ noted that, according to earnings records, he earned $3,325 in self-employment income in 2009. (Tr. 59; 305). Plaintiff asserted he had never earned that much money through self-employment. (Tr. 61). Plaintiff previously worked as a cleaner/housekeeper; an aide at a recovery center for youth; and as a janitor. (Tr. 58-61). He testified that he held these positions for less than a year.

At the time of the hearing, plaintiff was not receiving treatment for his mental conditions. He had briefly seen a psychiatrist about two years earlier but stopped when the practice closed. (Tr. 66). Plaintiff testified that he continued to be depressed and frequently contemplated suicide. (Tr. 69-70). He described himself as fearful and very tense inside when he was around more than a few people

because he felt as though people were thinking bad things about him. (Tr. 67-68). He generally tried to have someone accompany him if he went to the store.

Psychology expert Martin Oberlander, Ph.D., testified that reliable evidence in the medical records supported three Listings: Listing 12.02 (organic disorders);[5] Listing 12.04 (affective disorders);[6] and Listing 12.09 (substance abuse disorders). Dr. Oberlander opined that plaintiff had the capacity to engage in simple, routine, repetitive work activities, consisting of no more than three steps, and would function best when all instructions were communicated orally. Plaintiff was limited to working in a low-stress environment without high production quotas or frequent changes in tasks. (Tr. 78, 95). He was moderately limited in his capacity to engage in activities which require more than occasional contact with others, and thus should not have more than brief, superficial contact with a supervisor or work on conjoint projects or as a member of a team. (Tr. 74, 78). He had the capacity to engage in work activities for two-hour periods followed by a "slight break," lasting no longer than the usual workplace breaks. (Tr. 78, 92).

Vocational expert Steven Kuhn, M.A., was asked to identify the skill and exertion levels of plaintiff's past work. (Tr. 86-89). Mr. Kuhn characterized plaintiff's work at the recovery center as a light, semi-skilled job with a specific vocational preparation (SVP) of 3 (Tr. 89), and his past housekeeping work as light and unskilled. (Tr. 90). The ALJ asked Mr. Kuhn about the employment opportunities for an individual of plaintiff's age and education who could do simple, routine, repetitive work; could not use written or detailed instructions; could tolerate no

---

[5] Dr. Oberlander cited plaintiff's fetal alcohol syndrome, reading disorder, borderline intellectual functioning; and impulsive anger. (Tr. 71, 79).

[6] Dr. Oberlander cited plaintiff's diagnosis of depressive disorder, (Tr. 72), with anhedonia, feelings of guilt or worthlessness, difficulty concentrating, thoughts of suicide, and hallucinations, delusions or paranoid thinking. (Tr. 75-76).

more than superficial interaction with supervisors, coworkers, and the public; required a low stress job with no productions quotas or without frequent changes in the work routine; and could maintain concentration in two-hour segments. (Tr. 90). Mr. Kuhn opined that such an individual could perform plaintiff's past work as a housekeeping cleaner. (Tr. 91). Generally, such jobs are found at motels. (Tr. 94). Although cleaners generally are expected to complete a certain number of rooms during a shift, Dr. Oberlander opined that this work was within plaintiff's capacity. Id. In response to questions from plaintiff's counsel, Mr. Kuhn testified that a person who could maintain attention for no more than one-third of the work day or had outbursts lasting 10 to 20 minutes once a week would have difficulty maintaining employment in the national economy. (Tr. 96).

### III.  The ALJ's Decision

In the decision issued on March 13, 2014, the ALJ made the following findings:

1.   Plaintiff met the insured status requirements of the Social Security Act through June 30, 2010.

2.   Plaintiff did not engage in substantial gainful activity from his alleged onset date of June 1, 2008.

3.   Plaintiff has the following severe impairments: fetal alcohol syndrome, moderate major depressive disorder, borderline intellectual functioning, a history of alcohol dependence in remission, and a history of polysubstance abuse disorder in remission.

4.   Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: he is limited to simple, routine, and repetitive low-stress work without quotas and without frequent changes in routine. He is limited to noncomplex, verbal instructions. He can maintain

-14-

concentration for two-hour segments. He can have brief superficial contact with coworkers and supervisors and occasional contact with the public.

6.     Plaintiff is able to perform his past relevant work as a cleaner/housekeeper. This work does not require the performance of work-related activities precluded by his residual functional capacity.

7.     Plaintiff has not been under a disability within the meaning of the Social Security Act from June 1, 2008, through the date of the decision.

(Tr. 16-23).

## IV.     Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The

Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and

frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within

the national economy. <u>Banks v. Massanari</u>, 258 F.3d 820, 824 (8th Cir. 2001). <u>See also</u> 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff asserts that the ALJ improperly assessed his credibility and did not include all medically supported mental limitations in the residual functional capacity (RFC).

### Credibility

Credibility determinations are the province of the ALJ, and as long as "good reasons and substantial evidence" support the ALJ's evaluation of credibility, the Court will defer to the ALJ's decision. <u>Julin v. Colvin</u>, --- F.3d ---, 2016 WL 3457265, at *2 (8th Cir. June 24, 2016) (<u>quoting</u> <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005)). An ALJ may decline to credit subjective complaints "if the evidence as a whole is inconsistent with the claimant's testimony." <u>Id.</u> (<u>quoting</u> <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006)).

In evaluating a claimant's subjective complaints, the ALJ is required to consider all of the evidence, including objective medical evidence, the claimant's work history and the factors set out by <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984): "(1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions." <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738 (8th Cir. 2004) (<u>citing</u> <u>Polaski</u>, 739 F.2d at 1322). "When

rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors." Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (citation omitted). "[A]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them." Id. (alteration in original; citation omitted).

The ALJ found that plaintiff's subjective complaints were "out of proportion" with objective medical evidence. For example, the ALJ noted Dr. Olson's 2009 opinion that plaintiff had no more than mild work-related limitations. In addition, the ALJ noted that plaintiff did not seek treatment until 2009, nearly nine months after his alleged onset date. Indeed, the record reflects that, between February 2009 and January 2013, plaintiff had a total of four encounters for treatment of depression. This low frequency of treatment is inconsistent with allegations of disabling symptoms. In addition, in March 2009 and May 2011, plaintiff failed to keep appointments to check on the efficacy and side effects of the antidepressant medications he was prescribed. See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (addressing failure to follow recommended course of treatment in credibility analysis). There is no indication that plaintiff complained of depression in August 2009 when he sought treatment for a skin rash. Plaintiff suggests that his poor treatment record should not be weighed against his credibility because he lacked the financial resources to obtain treatment. However, he had medical assistance in 2009 and nonetheless failed to follow through with treatment.

The ALJ considered other inconsistencies that detracted from plaintiff's credibility. (Tr. 21-22). For example, he was vague regarding his documented past

earnings. In addition, Ms. Burnett's reports regarding the severity of plaintiff's lifelong problems arising from fetal alcohol syndrome were inconsistent with plaintiff's prior ability to perform significant work in 2005 and 2006. With respect to plaintiff's assertion that he was quite isolated in the performance of that job, the RFC accounted for his social difficulties by limiting contact with others. After considering the evidence in the record, the ALJ was "convinced that [plaintiff's] condition has waxed and waned over the course of the relevant period, but was not at a very serious level for more than one year as required by the Act." Furthermore, "the records indicate that the claimant began seeking mental health treatment related to intense situational stressors . . . which would reasonably prompt people without impairments to seek counsel." (Tr. 21-22).

The ALJ's credibility determination is supported by substantial evidence in the record as a whole.

### RFC Determination

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical

sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

In formulating the RFC, the ALJ accounted for the limitations on plaintiff's capacities to focus, tolerate the presence of other people, read, remember instructions, and cope with change. To the extent that plaintiff asserts that he has additional limitations not accounted for in the RFC, the ALJ appropriately rejected further restrictions based on her assessment of plaintiff's credibility. Plaintiff also argues that Dr. Oberlander testified that he needs to take "indeterminate breaks" every two hours, thereby precluding employment. However, Dr. Oberlander actually testified that plaintiff was able to sustain work activities for two-hour periods followed by a "slight break," of a duration within the expected norms of the jobs identified by the Vocational Expert.

Plaintiff argues that the ALJ did not give appropriate weight to the opinions of Dr. Konar and Dr. Baker. The ALJ gave reduced weight to Dr. Konar's opinion based on her assessment of plaintiff's credibility combined with his lack of regular treatment. This was permissible. See Julin, 2016 WL 3457265, at *4 (ALJ entitled to discount physician's opinion to the extent that it was based on plaintiff's subjective complaints). Plaintiff argues that the ALJ gave insufficient weight to Dr. Baker's assessment that his GAF was 45, which suggests serious symptoms or impairments. However, in his assessment of plaintiff's work-related functioning, Dr. Baker found no areas of marked or extreme limitation. The RFC fully accounted for Dr. Baker's findings that plaintiff was moderately limited with respect to the abilities to carry out complex instructions and make judgments on complex decisions. The

Plaintiff argues that Dr. Baker stated that by assigning a GAF of 45 he intended to indicate an inability to sustain employment. Dr. Baker's statement was made regarding another patient and thus is not relevant to the issues in this case.

The RFC determination is supported by substantial evidence in the record as a whole.

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2016.